STATE, Respondent, *v.* SIMPSON, Appellant.

(No. 7,950.)

(Submitted October 3, 1939. Decided October 16, 1939.)

[95 Pac. (2d) 761.]

200

*Mr. A. G. McNaught* and *Mr. Geo. E. Hurd,* for Appellant, submitted a brief, and argued the cause orally.

202

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. Lee Metcalf,* Assistant Attorney General, *Mr. Nat Allen,* County Attorney of Golden Valley County, and *Mr. Wellington D. Rankin,* for the State, submitted a brief; *Mr. Allen* and *Mr. Rankin* argued the cause orally.

MR. JUSTICE ARNOLD delivered the opinion of the court.

On September 2, 1938, in the district court of Golden Valley county, Montana, the defendant W. L. Simpson was convicted by a jury of murder in the first degree for the slaying, on April 14, 1938, of one Arthur Burford, a deputy sheriff of that county, the jury fixing the punishment by death. Judgment and sentence were pronounced on September 27, 1938, in accordance with the verdict. From the judgment and an order denying a new trial this appeal is prosecuted. The defendant made several assignments of error as will hereinafter appear. The evidence disclosed that the defendant made a full confession of the slaying on April 15, 1938, to the sheriff of Fergus county, Montana, in the jail at Lewiston, to which town he had fled during the night following the murder of Burford.

Early in April, 1938, the defendant Simpson was having trouble over livestock on his ranch. A replevin action had been filed against him by one Gibbs to recover a mare and colt. During the pendency of this action, and before the sheriff arrived to take possession of the mare and colt, he had directed three of his employees, Robert, Gerald and Richard McDonald, to take the colt and conceal it in the timber on his ranch, instructing them to cover up the tracks of the colt in the snow by driving over them. When the sheriff arrived to repossess the mare and colt Simpson offered him the mare and another colt which was refused by the plaintiff and sheriff on the ground that it was not the one which was sought in the action.

At about the same time two other young men named Harmon and Dunwald were sent to the state prison on pleas of guilty to a charge of stealing and butchering a calf belonging to the

defendant. The defendant had also complained to one T. R. Biggerstaff of the loss of a large number of sheep, Biggerstaff being the secretary of the Central Montana Production Credit Association, which association held a chattel mortgage on the sheep. On April 14, 1938, Biggerstaff, Hall Clement and Aaron McDonald, father of the aforesaid McDonald boys, went to the Simpson ranch to see about the sheep. After counting them and determining that there was no substantial loss of sheep, they approached the defendant's house to tell him about the satisfactory count, and on arriving at the yard of defendant, he came out with a rifle and warned the three men to come no further, stating that they had come far enough. He asked them the question, "Where is the other car?" and was advised that there was no other car. He also stated that he did not like the looks of things and directed his wife to search the Biggerstaff car to determine if anyone was concealed in the back seat. His wife examined the car and reported that everything was all right. At this time Aaron McDonald asked the defendant as to the whereabouts of his boys, Robert and Gerald, who apparently had been missing for three or four days.

Upon returning to Ryegate, Biggerstaff notified the sheriff that the defendant was acting "crazy." Late in the afternoon of that day sheriff Dolve and his deputy, Arthur Burford, went to the Simpson ranch for the purpose, as expressed by sheriff Dolve, of endeavoring to settle the difficulties peaceably and with no intention of arresting Simpson. The sheriff and his deputy each had a pistol but very little ammunition. When they arrived at the yard of defendant, the latter's wife came out of the barn, and upon being questioned by the sheriff as to whether her husband was sick or had been drinking, she stated that he had not been drinking and advised the officers that she would not talk. As they approached the house defendant's wife called his name "Lee" three times in what the sheriff described as warning tones. The defendant immediately appeared at the door of his house with a rifle. The sheriff was out of his car walking toward the house and Bur-

ford was still in the car. According to the sheriff, Simpson immediately opened fire upon him, firing three shots, and as the sheriff disappeared around the corner of the house, one of the bullets chipped the corner of the stone house.

There is a dispute as to who opened fire first, whether it was defendant Simpson or the deputy Burford—the defendant's wife being the only witness who asserted that the deputy opened fire first. Intermittently for several hours firing took place, the defendant firing forty or fifty shots and the deputy firing six or seven, a similar number of shots having been fired by the sheriff. The sheriff, after using up his shells and after the death of Burford, returned to Ryegate for a posse.

About 5:30 P. M. of that day the defendant shot and killed Burford, who was lying on the ground near the rear of his car. Burford had been previously wounded and while he was lying on the ground, his gun being empty of cartridges, the defendant approached him and, placing the muzzle of a pistol near his head, fired the bullet which caused his death. Several hours later when the sheriff returned from Ryegate with a posse, they found that the defendant had fled. He arrived in Lewistown in the early morning hours of April 15th, and after daylight telephoned to sheriff Guy Tullock, who came after him at the rooming house where he had registered under an assumed name. The sheriff took the defendant to the Fergus county jail where he made a full confession of the killing of Arthur Burford, and also confessed that he had killed the two McDonald boys on April 10, 1938. This confession was made in the presence of a number of witnesses. The defendant told where the McDonald boys' bodies could be found, and also the manner in which he had killed them, Robert having been killed by shooting with a rifle, and Gerald by a blow with an ax, Robert having been killed about noon, and Gerald in the evening of April 10th. Following the directions of the defendant, the bodies were found at the place he had described, and Dr. S. E. Crouse, who examined the bodies, found death wounds which could have been caused by the weapons the defendant said he had used.

The defendant assigns as error the refusal of the court ██ to sustain the challenge of juror C. M. Brovold. On direct examination this juror stated that he had formed an opinion based on talking with others and on newspaper accounts. The trial judge read to the juror the names of the witnesses endorsed on the information and asked him if he had talked to any of them, and he stated that he believed he had not. He stated to the court that he could give a fair and impartial verdict despite his opinion. On examination by counsel he stated that it would be pretty hard to set aside his opinion, but that he would try to rely on the evidence alone for a verdict and that he had formed no opinion as to the defendant's sanity or insanity. On cross-examination by defendant's counsel, this question was asked the juror: "Q. And there wouldn't be any use for all the other jurors to try to change that opinion; that opinion would be there; anything the other men might say about it you couldn't get rid of it? A. No, sir." Thus in answer to three separate questions framed in one sentence, we see a simple categorical denial which is contrary to the answer of another similar question put to the juror by the court as follows: "Q. Notwithstanding such opinion, do you think you could listen to the evidence introduced here by both sides and the instructions of the court and render a fair and impartial verdict after hearing all that and lay aside the present opinion? A. Yes, sir." The juror's answers as to his qualifications were mainly affirmations and denials in answer to questions, chiefly leading and suggestive, framed by counsel in anticipation of the answers. He admitted that his opinion was based only on rumor and that he would be willing to let jurors of his mind sit on his case if he were the defendant.

In challenging the juror the defendant's counsel merely stated, "We challenge the juror for cause." The court denied the challenge. The record shows that prior to the denial of the challenge by the court the defendant had exhausted three of his peremptory challenges, and that thereafter he exhausted his remaining seven peremptory challenges. At no

time did he exercise such a challenge against juror Brovold. This, of course, would not bar the defendant from asserting error on appeal, if the challenge for cause should have been sustained, since he exercised all of his remaining peremptory challenges after his challenge for cause had been denied.

The defendant cites in his brief the case of *State* v. *Brooks,* 57 Mont. 480, 188 Pac. 942, 943. That case holds as follows: "The rule is recognized everywhere, that if any objectionable juror is forced upon the defendant after he has exhausted his peremptory challenges, the ruling of the court denying a challenge for cause as to such juror will constitute reversible error if the challenge should have been sustained." It is thus seen that the case has no bearing on the facts in the case before us.

In cases of this nature ten peremptory challenges are allowed the defendant. There is, perhaps, no other country in the world that allows more peremptory challenges to one accused of crime. The policy of the law in allowing so large a number of peremptory challenges causes great expense to the government and long delay in the selection of a jury, but, in keeping with the policy of our system of jurisprudence of guaranteeing to everyone accused of crime the right to a trial by an impartial jury, we have long adhered to this safeguard.

In the examination of a juror to determine his competency the trial court is in a peculiarly advantageous position from observing his demeanor, his expression and his manner in answering questions. No doubt border-line cases will arise where both court and counsel may be in doubt as to a juror's impartiality, and it is for just such cases that we have liberal provisions in our law providing for peremptory challenges. Unless a clear abuse of discretion is shown, this court will not interfere with a trial court's ruling on a challenge for cause. (*State* v. *Hoffman,* 94 Mont. 573, 23 Pac. (2d) 972.)

The fact that a juror has formed an opinion is not ground for disqualification as indicated by section 11962, Revised Codes of 1935, provided the opinion formed or expressed is founded upon public rumor, statements in public journals or

common notoriety, and provided further that it appear to the court upon the juror's declaration under oath, or otherwise, that he can and will notwithstanding such opinion act impartially and fairly upon the matters to be submitted to him. The examination of the juror Brovold, carried out at length by court and counsel, indicates that, tested by the provisions of this section of the Code, he was competent to act, and the court's denial of the defendant's challenge was not error.

The next assignments of error, Nos. 2, 3 and 4, relate to admission of evidence concerning statements made by the defendant that he had killed the two McDonald boys on April 10, 1938. In admitting all this evidence the trial court was extremely cautious and stated to the jury each time that its sole purpose was to show motive, if any, which the defendant had in killing Arthur Burford, for the murder of whom he was on trial. Likewise in its instructions the court properly safeguarded defendant's rights by similar admonition. Such evidence of other crimes is admissible for the purpose of showing motive, as will appear in the Montana cases of *State* v. *Ebel,* 92 Mont. 413, 15 Pac. (2d) 233, *State* v. *Hopkins,* 68 Mont. 504, 219 Pac. 1106, *State* v. *Hughes,* 76 Mont. 421, 246 Pac. 959, *State* v. *Schlaps,* 78 Mont. 560, 254 Pac. 858, and *State* v. *McCracken,* 93 Mont. 269, 18 Pac. (2d) 302. The rule which Montana has followed, and to which we now adhere, is succinctly stated in 20 American Jurisprudence, page 289, as follows: ''Evidence of other crimes is always admissible when such evidence tends directly to establish the particular crime and it is usually competent to prove the motive, the intent, the absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others, or the identity of the person charged with the commission of the crime on trial.''

We cannot conceive of a case where the admission of evidence of another crime would be more helpful in determining motive than in this case. On April 14, 1938, when Biggerstaff, Clement and McDonald called at the defendant's house to see

about the sheep, the killing of the McDonald boys was known only to the defendant and his wife, although he believed then that the bodies had been found and his crime become known. This was shown for the purpose of accounting for his apprehensive attitude when he was trying to repel his visitors and directing his wife to search the car. The state also contended that this explains why his wife warned him on the approach of the sheriff and his deputy, and why the defendant opened fire upon the sheriff and his deputy in an attempt to resist what he believed was an effort to arrest him for the killing of the McDonald boys. In his confession he stated that he believed the killing of the McDonald boys was known two days prior to the visit of the sheriff and his deputy at his place. His attitude was akin to that described in the old proverb: The guilty flee when no man pursueth.

While this court has held that motive is not necessary in proving one guilty of the commission of a crime, it is not only desirable but the duty of the prosecuting attorney to prove motive, where such proof is available, as helpful in determining the guilt of the defendant or explaining his actions in the commission of the crime charged. Considerable latitude is necessarily permissible in proving motive. (*State* v. *Hollowell*, 79 Mont. 343, 256 Pac. 380.) We find no error in the admission of such evidence in this case.

In specification of error No. 5 the defendant contends that the court committed error in admitting answers of lay witnesses as to whether they believed defendant sane prior to April 13, 1938. The defendant followed a similar course in his effort to prove that he was insane, by having lay witnesses express their opinion that he was insane. That such evidence is admissible is well settled in Montana. The evidence of intimate acquaintances who have an opportunity to observe and do observe the actions of a person claimed to be insane is undoubtedly in many cases more helpful to a court and jury in arriving at a solution of the question than the theories of experts, who base their opinions on hypothetical questions and who have had little, if any, opportunity to observe the alleged

insane person over any but a brief period of time. The following Montana cases indicate that the court did not err in the admission of this line of testimony: *Territory* v. *Hart,* 7 Mont. 489, 17 Pac. 718; Id., 7 Mont. 42, 14 Pac. 768; *State* v. *Penna,* 35 Mont. 535, 90 Pac. 787; *State* v. *Berberick,* 38 Mont. 423, 100 Pac. 209, 16 Ann. Cas. 1077; *In re Bright's Estate,* 89 Mont. 394, 300 Pac. 229.

The defendant also assigns as error the giving of Instruction No. 38, which reads as follows:

"Testimony has been introduced relative to the alleged commission of other offenses of a · similar character claimed to have been committed by the defendant against one Robert McDonald and one Gerald McDonald, shortly before the alleged commission of the crime charged in the information. This testimony, in so far as it may tend to show the defendant guilty of such other offenses than that with which he is charged, must be disregarded by the jury, for he cannot be tried in this action for other offenses than the one charged. But such testimony was permitted for the sole purpose of showing a possible motive for the commission of the crime charged in the information, if you believe beyond a reasonable doubt that he committed such crime, and for no other purpose, except as hereinafter stated:

"You are not to consider any of the testimony offered in connection with said prior offenses, except to ascertain therefrom as to whether or not the same furnished a motive for the alleged commission of the crime charged in the information, and even though you should find from the evidence that the defendant actually committed said prior crimes, such finding should not in any manner affect your verdict in the case, except for the purpose for which said testimony was permitted, namely, on the question of motive. Provided, however, you may consider the testimony relative to such other offenses, together with all the other evidence in this case, in determining whether the defendant was sane or insane, when he committed the offense charged in the information, if you find from

all the evidence beyond a reasonable doubt he committed the crime charged.''

In this instruction the court restricted the effect to be given to the evidence relating to the killing of the McDonald boys. In doing this the court protected the defendant from improper consideration by the jury of that line of testimony, and we find no error in the giving of the instruction. It was not a comment on the evidence, as the court expressed no opinion as to its truth or falsity, or the weight to be given.

The defendant likewise assigns as error the giving of Instruction No. 25, which reads as follows: ''You are instructed that if, from all the evidence in the case, you believe, beyond a reasonable doubt, that the defendant committed the crime of which he is accused, in manner and form as charged in the information, and further find that at the time of the commission of such crime the defendant knew that it was wrong to commit such crime and was mentally capable of choosing either to do or not to do the act or acts constituting such crime, and of governing his conduct in accordance with such choice, then it is your duty, under the law, to find him guilty, even though you should believe from the evidence that at the time of the commission of the crime he was not entirely and perfectly sane.''

In view of the ruling of this court in the case of *State* v. *Narich*, 92 Mont. 17, 9 Pac. (2d) 477, we must hold that no error was committed in the giving of this instruction. The question of the defense of insanity was properly submitted to the jury by other appropriate instructions, the giving of which is not attacked on this appeal.

Finally, the defendant assigns as error the remarks of special prosecutor Rankin in arguing the case to the jury. His remarks, to which exception was taken, are as follows: ''Every bit of this evidence of insanity is sham. They have proven nothing. Nothing. That burden is upon them. They have told you, 'Return a verdict of not guilty by reason of insanity.' Do you know what that means? Do you know when you walk into this jury room and come out that door there

of the jury room and you walk up here with a verdict that reads 'Not guilty by reason of insanity,' that this defendant walks out of this court room, and there is no power under the law to stop him until some new order is issued?'' This was not an improper comment by counsel on the evidence, and in no way prejudiced the defendant. His statement, that "there is no power under the law to stop him until some new order is issued" in the event a verdict of not guilty by reason of insanity were returned, would be a natural consequence of such acquittal, and was not an improper discussion of fact or law not related to the case. Counsel may properly argue and comment on self-evident facts and matters of common knowledge outside of the record, unless harm might fairly be inferred to follow therefrom. (64 C. J. 265.) This court has held that the purpose of a trial of one accused of crime is to determine the guilt or innocence of the defendant. The jury found the defendant guilty of the crime charged after hearing competent and convincing evidence, aside from his confession.

Finding no error in the record, the judgment and order denying defendant a new trial are affirmed.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES MORRIS, ANGSTMAN and ERICKSON concur.

Rehearing denied November 17, 1939.